**STATE FARM MUTUAL AUTOMO-
BILE INSURANCE COMPA-
NY, Plaintiff,**

v.

**Tony Montana SMITH,
et al. Defendants.**

**No. 1:04 CV 00082.**

United States District Court,
W.D. Virginia,
Abingdon Division.

Nov. 1, 2004.

James E. Rasnic, Ward, Bishop & Rasnic, P.C., Bristol, VA, for Plaintiff.

A. Benton Chafin, Chafin Law Firm, P.C., for Defendants Tony Montana Smith and Brenda Smith.

Thomas H. Lawrence, Lawrence & Russell, L.L.P., Memphis, TN, for Defendant BlueCross BlueShield of Tennessee, Inc.

John M. Scannapiece, Boult, Cummings, Conners, & Berry, PLC, Nashville, TN, for Defendant CHS/Community Health Systems, Inc. Group Health Plan.

**OPINION AND ORDER**

JONES, Chief Judge.

In this ERISA case, the question is whether the Virginia antisubrogation statute applies to medical expenses paid by an employee welfare benefit plan for the victim of an automobile accident, where the plan was self-funded for the medical benefits paid, but offered vision care benefits that were funded by insurance. I hold that the fact that the plan in question offered other separate insured benefits, not involved in the present dispute, did not exempt the Virginia statute from ERISA preemption.

I

State Farm Mutual Automobile Insurance Company ("State Farm") filed this action in the Circuit Court of Washington County, Virginia, seeking approval of the compromise settlement of a personal inju-

ry claim by a minor, Tony Montana Smith. The petition by State Farm recited that Smith had been seriously injured in an accident on September 15, 2003, in Washington County, when the car in which he was a passenger, driven by an insured of State Farm's, ran off the road. State Farm offered the policy liability limits of $100,000, subject to the approval of the court.

State Farm also named as parties to its action the defendants BlueCross Blue Shield of Tennessee, Inc, ("BCBS") and CHS/Community Health Systems, Inc. Group Health Plan ("the Plan"), alleging that BCBS had paid on behalf of the Health Plan the amount of $75,127.16 in medical expenses for Smith resulting from the accident. Because BCBS and the Plan had asserted a right of subrogation as to any settlement proceeds, which right Smith disputed, State Farm requested that the court, in addition to approving the settlement, direct the distribution of the settlement proceeds as between Smith and the adverse claimants.

Following institution of the state court action, BCBS removed the action to this court, asserting federal jurisdiction on the basis of 28 U.S.C.A. § 1335 (West 1993), statutory interpleader.[1] Thereafter, both BCBS and the Plan moved for summary judgment, contending that the antisubrogation provision of state law was preempted and inapplicable because the medical benefits afforded Smith were paid pursuant to a self-funded employee welfare benefit plan governed by the provisions of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C.A. §§ 1001–1144 (West 1999).

Smith responded to the Motions for Summary Judgment by arguing that "ERISA only preempts anti-subrogation law when the employee's benefit plan is *fully self-funded*, that is, if the employer and the employee pay all the benefits distributed by the plan." (Resp. to Mot. Summ. J. 1–2 (emphasis added).) Smith has pointed out that certain vision care benefits under the Plan are funded by insurance. Therefore, the precise issue before me is whether an employee welfare benefit plan that funds most, but not all, of its participants' benefits is precluded from being deemed a "self-funded" plan under the circumstances of this case.

The Motions for Summary Judgment have been briefed and argued and are ripe for decision.

## II

The facts of the case are not in dispute. Tony Montana Smith's mother, Brenda Smith, was employed in Virginia by the Russell County Medical Center, a facility owned by CHS/Community Health Systems, Inc. ("CHS") and covered by the Plan. Tony Montana Smith is covered un-

---

1. No objection to removal, or to the subject matter jurisdiction of this court, has been made. Jurisdiction exists under the federal interpleader statute if two or more of the adverse claimants have diverse citizenship and the amount in controversy exceeds $500, 28 U.S.C.A. § 1335(a), both of which conditions are met in this case. Because some of the defendants are residents of Virginia, this action should not be removable, *see* 28 U.S.C.A. § 1441(b) (West 1994); *Mid–Century Ins. Co. v. Menking*, 327 F.Supp.2d 1049, 1051 n. 1 (D.Neb.2003), but because no time-ly motion to remand was made, this defect is deemed waived, *see Ravens Metal Prods., Inc. v. Wilson*, 816 F.Supp. 427, 428–29 (S.D.W.Va.1993). Similarly, while the stakeholder is normally required to deposit the amount in dispute into court or post a bond, neither of which has been done here, no objection has been made on this ground, and such requirement is not jurisdictional. *See* 7 Charles Alan Wright, Arthur R. Miller, and Mary Kay Kane, *Federal Practice and Procedure* § 1716 (3d ed.2001).

der the Plan because he is a minor dependent of his mother.

The Plan is described as a "[w]elfare benefit plan providing health care benefits." (Summary Plan Description ("SPD") 48.) Under the Plan, most of the benefits are paid from funds maintained in a trust established by CHS in its capacity as Plan Sponsor. Both eligible employees and CHS make contributions to the trust to cover the cost of providing benefits. Medical and dental benefits under the Plan are not funded in whole or in part by any policy of insurance, although they are administered by BCBS. However, "[v]ision care benefits are provided through a separate fully-insured plan called the Vision Service Plan." (*Id.* at 23.) These benefits cover services such as eye examinations, corrective lenses, and eyeglass frames. A copayment by a participant is required for covered vision care benefits. The vision care benefits are not administered by BCBS nor by the Plan, but by the separate Vision Service Plan. (*Id.* at 48.)

None of the disputed medical payments in this case were made under the Vision Service Plan. Rather, the payments all relate to the injuries Smith received in the automobile accident, which included "multiple scalp abrasions, hematomas, fluid in the right ear, closed head injury, skull fracture, multiple facial fractures, pulmonary contusion." (Pet. for Approval of Compromise ¶ 2.) In regard to benefits for such injuries, the Plan's subrogation provision states in part:

> A third party (including an insurer) may be liable or legally responsible for expenses incurred by a Covered Person for Illness, a sickness, or a bodily Injury. Benefits may also be payable under this Plan for such expenses. When this happens, the Plan Administrator may, at its option:
>
> \* Take over the Covered Person's right to receive payment of benefits

from the third party and any insurer ("Subrogation").

(SPD 29.)

Virginia's antisubrogation statute states in part:

> [N]o subscription contract or health services plan ... providing for payment of benefits to or on behalf of persons residing in or employed in this Commonwealth shall contain any provision providing for subrogation of any person's right to recovery for personal injuries from a third person.

Va.Code Ann. § 38.2–3405(A) (Michie Supp.2004).

ERISA has a broad preemption power—"[e]xcept as provided in subsection (b) of this section, the provisions of this subchapter and subchapter III of this chapter shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan ...." 29 U.S.C.A. § 1144(a). An exception to this broad preemption power covers state laws that regulate insurance. *See id.* § 1144(b)(2)(A). Because the employee benefit plan in question is governed by ERISA, Virginia's antisubrogation statute is preempted unless ERISA's saving clause excludes the Virginia statute from such preemption. Therefore, assuming that the Virginia antisubrogation statute "relate[s] to" employee benefit plans, *see Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 96–97, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983) (holding that a law relates to an employee welfare plan if it has "a connection with or reference to such a plan"), the only issue is whether the employee benefit plan in question is bound by the Virginia law because of the saving clause, or is taken out of the saving clause by ERISA's so-called "deemer clause."

Under ERISA's deemer clause, 29 U.S.C.A. § 1144(b)(2)(B), certain employee benefit plans are not "deemed to be an

insurance company or other insurer ... or to be engaged in the business of insurance or banking for purposes of any law of any State purporting to regulate insurance companies, insurance contracts, banks, trust companies, or investment companies." The Supreme Court has held that this provision exempts "self-funded ERISA plans from state laws that 'regulat[e] insurance' within the meaning of the saving clause." *FMC Corp. v. Holliday,* 498 U.S. 52, 61, 111 S.Ct. 403, 112 L.Ed.2d 356 (1990). The Court reasoned that state laws regulating insurance "do not reach self-funded employee benefit plans because the plans may not be deemed to be insurance companies, other insurers, or engaged in the business of insurance for purposes of such state laws." *Id.* While these self-funded plans are beyond the reach of state laws regulating insurance, the Court made clear that "employee benefit plans that are insured are subject to indirect state insurance regulation." *Id.* Therefore, ERISA preempts state law from operating on employee benefit plans if the plan is self-funded.

In *FMC Corp.,* the Court described the plan in that case as self-funded, noting that it did "not purchase an insurance policy from any insurance company in order to satisfy its obligations to its participants." 498 U.S. at 54, 111 S.Ct. 403. However, the fact that a plan may be partially insured does not necessarily preclude it from being considered self-funded. *See Am. Med. Sec., Inc. v. Bartlett,* 111 F.3d 358, 361 (4th Cir.1997) (stating that "plans that are self-funded or self-insured may not themselves be regulated as insurance companies even if the self-funded or self-insured plan purchases stop-loss insurance to cover losses or benefits payments beyond a specified level"). In that case, the Fourth Circuit articulated a fundamental difference between self-funded and insured plans:

The state's regulations fail to recognize that in a self-funded plan, with or without stop-loss insurance and regardless of the attachment point, the provision of benefits depends on the plan's solvency, whereas the provision of benefits in an insured plan depends entirely on the insurer's solvency. It is this fundamental difference that precludes the Maryland Insurance Agency from regulating self-funded plans but permits them to regulate insurance companies that provide health benefits to plans for their participants.

*Id.* at 364. The court contrasted plans that buy health insurance for participants, stating that in such cases the participants "have a legal claim directly against the insurance company, thereby securing the benefits even in the event of the plan's insolvency. Participants and beneficiaries in self-funded plans may not have the security of the insurance company's assets because stop-loss insurance insures the plan and not the participants." *Id.*

The Ninth Circuit has directly addressed the situation at hand, holding that plans are not precluded from being deemed self-funded merely because they provide other types of benefits to participants that are paid by an insurance policy. *See United Food & Commercial Workers & Employers Ariz. Health & Welfare Trust v. Pacyga,* 801 F.2d 1157, 1162 (9th Cir.1986). The court in *Pacyga* explained that "[t]he fact that the Plan also provides certain other types of benefits to its participants, and that those benefits are partly paid by an insurance policy, does not change...[the] result [that the plan should be termed a non-insured plan, protected by the deemer clause and preemptive of the Arizona antisubrogation law]." *Id.* The plan in *Pacyga* paid life insurance benefits and accidental death and dismemberment benefits partially with insurance. *Id.* Despite this, the court concluded that

such benefits are distinct "from the health benefits provided by the Plan, and the subrogation clause appears in the health benefits pamphlet. These other types of benefits provided by the Plan are not amenable to the assignment requirements for payment of health benefits and should not take the Plan out of the protection of the deemer clause." *Id.* Therefore, under this view, an otherwise self-funded plan does not cease to be self-funded merely because it provides certain additional benefits to participants that are partly paid by an insurance policy.

In this case, the medical benefits afforded Smith under the Plan did not depend on the solvency of an insurer because Smith's expenses were completely unrelated to any vision care benefits.

In addition, the subrogation provision of the present Plan is limited to "expenses incurred by a Covered Person for an *Illness, a sickness, or a bodily Injury*," (SPD 29 (emphasis added)), and thus would not normally apply to vision care benefits. The Summary Plan Description describes such vision care benefits as falling under a "*separate* fully-insured plan," for which there is a separate copayment. (*Id.* at 23) (emphasis added). Here, as in *Pacyga*, the insured benefits provided by the plan are sufficiently different from the other self-funded benefits, "and should not take the Plan out of the protection of the deemer clause." 801 F.2d at 1162.

### III

For the foregoing reasons, it is **ORDERED** that the Motions for Summary Judgment by defendants BCBS and the Plan are **GRANTED** and the court declares that BCBS and the Plan are entitled to enforce the subrogation provisions of the Plan as to the proceeds of any compromise settlement paid by State Farm.

This case requires the court to approve any such compromise settlement pursuant to the provisions of Va.Code Ann. § 8.01–424 (Michie 2000). Of course, it is possible that it is not in the interest of the minor that the compromise settlement be approved, in light of the fact that most of the proceeds would go to reimbursement of the medical expenses. Nevertheless, unless the petition seeking approval is withdrawn, I will schedule a hearing in order to receive evidence and argument of counsel and determine whether to approve the proposed compromise settlement.